**Below is an Opinion of the Court.**

1

2

3

4

5

6

*Randall L. Dunn*
_____
RANDALL L. DUNN
U.S. Bankruptcy Judge

7

8

9                    UNITED STATES BANKRUPTCY COURT

10                      FOR THE DISTRICT OF OREGON

11  In Re:                      )  Bankruptcy Case
                                )  No. 07-31717-rld13
12  Michael Lloyd Johnson and   )
    Jennifer Dawn Johnson,      )
13                              )  **AMENDED** MEMORANDUM OPINION
                   Debtors.     )
14

15          The issue before me requires that I plunge further into the

16  semantic briarpatch generally referred to as the Hanging Paragraph, added

17  to § 1325(a) of the Bankruptcy Code by the Bankruptcy Abuse Prevention

18  and Consumer Protection Act of 2005 ("BAPCPA").[1]  Specifically, I must

19  decide whether a creditor holds a purchase money security interest

20  ("PMSI") for purposes of the Hanging Paragraph, where a portion of its

21

22

23  ─────────────────

24      [1]Unless otherwise indicated, all chapter, section and rule
    references are to the Bankruptcy Code, §§ 101-1532, and to the Federal
25  Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and
    promulgated as of October 17, 2005, the effective date of most of the
26  provisions of BAPCPA (Pub. L. 109-8, April 20, 2005, 119 Stat. 23).

Page 1 -  **AMENDED** MEMORANDUM OPINION

debt represents financing of negative equity[2] in a vehicle traded in by the debtors at the time the debtors purchased their new car.

BACKGROUND

On January 4, 2006, Michael and Jennifer Johnson ("the Johnsons") purchased a 2005 Chrysler Sebring ("Vehicle") from Gresham Chrysler Jeep, Inc. ("Dealer"). Daimler Chrysler Services Americas LLC ("DaimlerChrysler") financed the purchase of the Vehicle. The amount financed was $26,078, an amount which the parties agree included $8,990 in negative equity in the 2003 Chevrolet Cavalier ("Trade In") that the Johnsons traded in as part of the transaction in purchasing the Vehicle.

The Johnsons filed their voluntary petition for relief under chapter 13 of the Bankruptcy Code on May 1, 2007 ("Petition Date"), a date within the 910-day period after their purchase of the Vehicle. As set forth in the proof of claim ("Claim") filed by DaimlerChrysler, to which the Johnsons have not objected, the Johnsons owed DaimlerChrysler $24,869.06[3] as of the Petition Date in connection with DaimlerChrysler's financing. In their chapter 13 plan dated May 4, 2007 ("Plan"), the

---

[2]"Negative equity is the amount by which the outstanding loan balance exceeds the value of the trade-in vehicle." In re Lavigne, No. 07-30192, 2007 WL 3469454 at *1 n.1 (Bankr. E.D. Va. Nov. 14, 2007).

[3]In its Memorandum in Support of DaimlerChrysler's Objection to Confirmation, DaimlerChrysler states that the total amount financed was $26,975 and that the current debt is $25,191.81. DaimlerChrysler's Claim, supported by a copy of the Retail Installment Contract, reflects the amount financed as $26,078. The Claim further reflects the amount of the debt as of the Petition Date as $24,869.06. It is this amount that DaimlerChrysler contends should be treated as a secured claim under the Plan.

Page 2 – **AMENDED** MEMORANDUM OPINION

Johnsons propose to treat $13,800 of the Claim as secured, and the balance of the Claim as unsecured. The Plan estimates that unsecured creditors will receive an approximate 40% distribution on their claims.

DaimlerChrysler contends that its finance of the negative equity in the Trade In constitutes "value given to enable the [Johnsons] to acquire rights in or the use of the [Vehicle]." Accordingly, DaimlerChrysler objects to the Plan on the basis that because it holds a PMSI in the Vehicle, purchased by the Johnsons within 910 days preceding the Petition Date for their personal use, the Hanging Paragraph prevents the Johnsons from using § 506 to bifurcate the Claim into secured and unsecured components. DaimlerChrysler asserts that the Plan must provide for the payment of the Claim in the amount filed, _i.e._, $24,869.06, in equal monthly installments. The Johnsons counter that DaimlerChrysler's financing of negative equity does not constitute a purchase money obligation, and therefore cannot give rise to a PMSI. It is their position that because DaimlerChrysler does not hold a PMSI in connection with that portion of the Claim relating to the finance of negative equity, DaimlerChysler is not entitled to the protection afforded by the Hanging Paragraph.

On October 18, 2007, I heard argument on DaimlerChrysler's objection to confirmation of the Plan, after which I took the matter under submission. This Memorandum Opinion constitutes my findings of fact and conclusions of law, which I make pursuant to Fed. R. Civ. P. 52(a), applicable in this contested matter pursuant to Fed. R. Bankr. P. 9014. I have core jurisdiction to resolve plan confirmation issues pursuant to 28 U.S.C. §§ 1334(b), 157(a), 157(b)(1), and 157(b)(2)(L).

Page 3 - **AMENDED** MEMORANDUM OPINION

DISCUSSION

A.  <u>Treatment of DaimlerChrysler's Claim Under the Plan</u>.

In order to have the Plan confirmed, the Johnsons must provide one of three alternative treatments with respect to any allowed secured claim of DaimlerChrsyler: (1) DaimlerChrysler must consent to its treatment under the Plan; (2) the Johnsons may retain the Vehicle and provide a stream of payments to DaimlerChrysler; or (3) the Johnsons must surrender the Vehicle to DaimlerChrysler.  <u>See</u> § 1325(a)(5).  Because the Johnsons have elected to retain the Vehicle, and to provide DaimlerChrysler with a stream of payments, § 1325(a)(5)(B) requires, among other things, that the Plan distribute to DaimlerChrysler the present value of its allowed secured claim as of the Petition Date, and provide for equal monthly payments in an amount sufficient to provide adequate protection to DaimlerChrysler.

DaimlerChrsyler contends it has additional rights with respect to its treatment under the Plan; under the Hanging Paragraph, DaimlerChrysler asserts the present value of its allowed secured claim must be the full amount of its debt, <u>i.e.</u>, the amount of the Claim, as of the Petition Date.

Effective in cases filed on or after October 17, 2005, BAPCPA added the Hanging Paragraph to § 1325(a).  As relevant to the matter before me, the Hanging Paragraph provides:

> For purposes of paragraph [1325(a)](5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [period] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor

Page 4 -  **AMENDED** MEMORANDUM OPINION

vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor. . . .

The Hanging Paragraph has been the subject of substantial litigation and disputes regarding its interpretation. It is now settled in this circuit, through decisions of the Bankruptcy Appellate Panel,[4] that the Hanging Paragraph applies to § 1325(a)(5) to preclude debtors from using cramdown[5] of a secured claim with respect to a vehicle purchased within 910 days prior to a bankruptcy petition, provided that the secured creditor's claim satisfies the criteria set by the Hanging Paragraph. To fall within the protection of the Hanging Paragraph, the secured claim must meet the following conditions:

> The creditor must have a purchase-money security interest; and
> The purchase-money security interest must secure the debt that is the subject of the claim; and
> That debt must be incurred no more than 910 days before the date of the debtor's filing; and
> The collateral for the debt must be a "motor vehicle"; and
> That motor vehicle must have been acquired for the personal use of the debtor.

In re Trejos, 352 B.R. 249, 264 (Bankr. D. Nev. 2006).

The only issue in the dispute before me is whether DaimlerChrysler has a PMSI in the Vehicle. The issue arises because the financing which forms the basis of the Claim includes funds provided both

/ / /

---

[4]See Wells Fargo Financial Acceptance v. Rodriguez (In re Rodriguez), 375 B.R. 535 (9th Cir. BAP 2007); Trejos v. VW Credit, Inc. (In re Trejos), 374 B.R. 210 (9th Cir. BAP 2007).

[5]For a brief explanation of the concept of cramdown and its operation, see In re Sanders, No. 07-50783-C, 2007 WL 3047233 at *4-5 (Bankr. W.D. Tex. Oct. 18, 2007).

Page 5 - **AMENDED** MEMORANDUM OPINION

for the Johnsons' purchase of the Vehicle and for payoff of the Johnsons'
negative equity in the Trade In.

B.  <u>Whether a PMSI Exists is Determined By State Law</u>.

      The Bankruptcy Code does not define the term "purchase money security interest."  It is lifted from the Uniform Commercial Code ("UCC"), which has been enacted with variations among the states as state code law.

      At least one bankruptcy court has suggested that a uniform federal definition or interpretation of "purchase money security interest" should be developed and applied.  <u>See</u> <u>In re Westfall</u>, 365 B.R. 755, 759 n.4 (Bankr. N.D. Ohio 2007) ("Westfall I"), with further elaboration in <u>In re Westfall</u>, 376 B.R. 210, 212-20 (Bankr. N.D. Ohio 2007) ("Westfall II").  In addition, Official Comment 8 to § 9-103 of the UCC ("Official Comment 8"), promulgated pre-BAPCPA, indicates that usage of the term "purchase money security interest" under Article 9 of the UCC is not meant to preempt the definition or characterization of the term under other statutes, including the Bankruptcy Code.[6]

_____

[6]Official Comment 8 states:

. . . This section addresses only whether a security interest is a "<u>purchase-money</u> security interest" under this Article . . . In particular, its adoption of the dual-status rule, allocation of property rules, and burden of proof standards for non-consumer-goods transactions is not intended to affect or influence characterizations under other statutes.  Whether a security interest is a "<u>purchase-money</u> security interest" under other law is determined by that law.  For example, decisions under Bankruptcy Code section 522(f) have applied both the

(continued...)

Page 6 -  **AMENDED** MEMORANDUM OPINION

I can appreciate the irony in developing federal common law to interpret a state law code term to aid in the interpretation of a federal law code provision. However, I find it inappropriate to do so. I join with most other courts that have considered the issue and look to state law to determine whether DaimlerChrysler holds a PMSI. <u>See</u>, <u>e.g.</u>, <u>Trejos v. VW Credit, Inc. (In re Trejos</u>), 374 B.R. 210, 215 (9th Cir. BAP 2007); <u>In re Lavigne</u>, No. 07-30192, 2007 WL 3469454 at *5 (Bankr. E.D. Va. Nov. 14, 2007); <u>In re Pajot</u>, 371 B.R. 139, 147 (Bankr. E.D. Va. 2007).

Under Oregon's version of the UCC, DaimlerChrysler's security interest is a PMSI "to the extent" the Vehicle is "purchase-money collateral with respect to that security interest." O.R.S. § 79.0103(2)(a). The Vehicle constitutes "purchase money collateral" if it represents "goods or software that secures a purchase-money obligation incurred with respect to that collateral." O.R.S. § 79.0103(1)(a). In order for DaimlerChrysler to have a PMSI as a result of financing negative equity, the negative equity must be a purchase money obligation incurred with respect to the Vehicle. Oregon law defines a purchase money obligation to be an "obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the

/ / /

_____

[6](...continued)
dual-status and the transformation rules. The Bankruptcy Code does not expressly adopt the state law definition of "<u>purchase-money</u> security interest." Where federal law does not defer to this Article, this Article does not, and could not, determine a question of federal law.

(emphasis in original).

Page 7 -  **AMENDED** MEMORANDUM OPINION

debtor to acquire rights in or the use of the collateral if the value is in fact so used." O.R.S. § 79.0103(1)(b).

C. DaimlerChrysler's Finance of Negative Equity Does Not Constitute a Purchase Money Obligation.

O.R.S. § 79.0103(1)(b) imposes an alternative test for a purchase money obligation: the debt must have been incurred as "all or part of the price of the collateral," or it must have been incurred "for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used."

1. Price of the collateral.

Courts have reached different conlcusions on whether the "price of the collateral" includes negative equity. "The case law grappling with this issue has reached opposite conclusions, when trying to decide whether the term ["price of the collateral"] could include the negative equity paid off by part of the loan." In re Sanders, No. 07-50783-C, 2007 WL 3047233 (Bankr. W.D. Tex. Oct. 18, 2007).

Courts that have held that financing extended to cover negative equity constitutes part of the "price of the collateral" rely primarily on Official Comment 3 to § 9-103 of the UCC ("Official Comment 3"), or on the doctrine of in pari materia[7] to conflate the definition of cash sale price contained in state automobile sales and finance laws with the term "price of the collateral" in UCC § 9-103, or both.

_____

[7]Statutes in pari materia are to be construed together, as dealing with the same subject matter.

Page 8 – **AMENDED** MEMORANDUM OPINION

Although the term "price" is not defined in the UCC, Official Comment 3 provides some guidance as to its meaning.  Official Comment 3 provides:

> [T]he "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.

In analyzing "price of the collateral" in light of Official Comment 3, one court has stated that "it is not apparent why a refinancing of rolled-in negative equity on a trade-in as part of a motor vehicle sale could not constitute an 'expense incurred in connection with acquiring rights in' the new vehicle." <u>GMAC v. Peaslee (In re Peaslee)</u>, 373 B.R. 252, 259 (W.D.N.Y. 2007) ("<u>Peaslee II</u>").  The court continues: "If the buyer and seller agree to include the payoff of the outstanding balance on the trade-in as an integral part of their transaction for the sale of the new vehicle, it is difficult to see how that could *not* be viewed as such an expense." <u>Id.</u> (emphasis in original).

Official Comment 3 further requires that for a PMSI to arise, there must be a "close nexus between the acquisition of the collateral and the secured obligation."  Some courts have found this close nexus in the financing of negative equity because the parties have agreed to a "package transaction."

> The trade-in of the vehicle was an integral part of the sales transaction.  The value of that trade-in along with its accompanying debt affected the ultimate price that was paid for the new pick-up truck.  The negative equity is inextricably intertwined with the sales transaction and the financing of the purchase.  This close nexus between the negative equity and this package transaction supports the conclusion that negative

Page 9 -  **AMENDED** MEMORANDUM OPINION

1    equity must be considered as part of the price of the
     collateral.
2

3    Graupner v. Nuvell Credit Corp. (In re Graupner), Case No. 4:07-CV-37CDL,

4    2007 WL 1858291 at *2 (M.D. Ga. June 26, 2007).

5         Further, some courts which have found that the price of a

6    vehicle includes financed negative equity rely on the doctrine of in pari

7    materia to incorporate the definition of "cash sale price" from state

8    automobile sales and finance laws.  In some states, the definition of

9    "cash sale price" explicitly includes negative equity financed as part of

10   the sale transaction.  See Peaslee II, 373 B.R. at 260 (under New York's

11   Motor Vehicle Retail Installment Sales Act, the "cash sale price . . .

12   may include the unpaid balance of any amount financed under an

13   outstanding motor vehicle loan agreement . . . ."); Graupner, 2007 WL

14   1858291 at *2 n.1 (under the Georgia Motor Vehicle Sales Finance Act,

15   cash sales price includes negative equity); In re Petrocci, 370 B.R. 489,

16   501 (Bankr. N.D.N.Y. 2007)(the term "price" as used in New York's UCC

17   § 9-103 must be given the meaning set forth in the New York Motor Vehicle

18   Retail Installment Sales Act's definition of "cash sales price," which

19   includes negative equity).

20        Other courts, using various arguments directly contrasting with

21   the analyses discussed above, hold that negative equity is not a

22   component of the "price of the collateral".

23        One line of reasoning refutes the idea that negative equity

24   constitutes one of the "expenses incurred in connection with acquiring

25   rights in the collateral" contemplated by Official Comment 3.  See, e.g.,

26   In re Pajot, 371 B.R. at 149-50 (list of expenses to be included in the

Page 10 - **AMENDED** MEMORANDUM OPINION

price of the collateral as set forth in Official Comment 3 does not contemplate the inclusion of negative equity); _In re Price_, 363 B.R. 734, 741 (Bankr. E.D.N.C. 2007)(advances to pay off balance of debt on vehicle that was traded in are not part of the purchase price; they are "significantly and qualitatively different from the fees, freight charges, storage costs, taxes, and similar expenses that are typically part of an automobile sale.").

A second line of reasoning disagrees that inclusion of negative equity in a single package financing agreement constitutes a sufficient nexus between the acquisition of the collateral and the secured obligation to transform negative equity into part of the price of the vehicle financed. Rather, in that circumstance, there are simply "two separate financial transactions memorialized on a single retail installment contract document. . . ." _In re Price_, 363 B.R. at 741-42; _see also In re Mitchell_, No. 07-02913, 2007 WL 3378229 (Bankr. M.D. Tenn. Nov. 13, 2007); _Citifinancial Auto v. Hernandez-Simpson (In re Hernandez-Simpson)_, 369 B.R. 36 (D. Kan. 2007).

Those courts which refuse to use in pari materia to incorporate a definition of "cash sale price" from state automobile sales and finance laws do so for several reasons.

First, some courts hold that because the term "price of the collateral" is not ambiguous, in pari materia, a doctrine of statutory interpretation, is not available to incorporate definitions of "cash sale price" under state automobile sales and finance laws. _See In re Blakeslee_, No. 07-1019-3F3, 2007 WL 3133937 (Bankr. M.D. Fla. Sept. 19, 2007)(term "price of the collateral" in Florida's version of UCC § 9-103

Page 11 - **AMENDED** MEMORANDUM OPINION

is clear on its face; it "has the same meaning that it has always had in connection with transactions for the acquisition of any collateral, including a motor vehicle, which is the actual price of the collateral being acquired.")(quoting In re Peaslee, 358 B.R. 545, 556 (Bankr. W.D.N.Y. 2006)("Peaslee I"), rev'd, Peaslee II, 373 B.R. 252 (W.D.N.Y. 2007)); In re Acaya, 369 B.R. 564, 570 (Bankr. N.D. Cal. 2007)(concluding that financing used to pay negative equity does not constitute part of the price of the collateral as contemplated by UCC § 9-103; "[t]here is no indication in the [California Automobile Sales Finance Act or its legislative history] that . . . "cash price" was intended to effect a departure from the traditional understanding of a purchase money security interest.").

        Other courts decline to use the in pari materia doctrine to graft the definition of "cash sale price" from state automobile sales and finance laws onto the term "price of the collateral" as used in the definition of a purchase money obligation under the UCC because the two statutes do not relate to the same subject matter or do not have the same purpose.  See, e.g., In re Lavigne, 2007 WL 3469454 at *7.

        At least one court has applied in pari materia to conclude that negative equity is not part of the "price of the collateral" because the state automobile sales and finance law definition of "cash sale price" does not expressly include negative equity.  In re Conyers, No. 07-50855, 2007 WL 3244106 at *4-5 (Bankr. M.D.N.C. Nov. 2, 2007).

        In another vein, one court advocates a "straightforward," contextual reading of the phrase "price of the collateral" within the UCC, and rejects the proposition that "price of the collateral" includes

Page 12 - **AMENDED** MEMORANDUM OPINION

1  negative equity.

2      Context thus bolsters the conclusion that "price of the
   collateral" need not be given some exotic meaning or treated as
3  some peculiar argot to sweep up more than the common
   understanding of the phrase is intended to convey.  One may
4  borrow money to buy something (_e.g._, a new vehicle), and also
   borrow additional money for some other purpose (_e.g._, to pay
5  off the balance of a loan for the trade-in vehicle).  The part
   used to buy something is purchase money obligation.  The part
6  used for some other purpose is not.  We can tell what part was
   used to buy something by simply looking at the price of the
7  thing purchased.

8  <u>In re Sanders</u>, 2007 WL 3047233 at *12.

9          I agree that "price of the collateral" does not include negative

10 equity.  Negative equity is not similar in nature or scope to the other

11 "expenses incurred in connection with acquiring rights in the collateral"

12 contemplated by Official Comment 3.  More importantly, I agree with the

13 <u>Lavigne</u> court that the liability for negative equity is not an expense

14 "incurred in connection with acquiring" the Vehicle; it is an antecedent

15 debt.

16      That liability necessarily preceded the acquisition.  The pre-
   existing indebtedness was simply rolled into the new car loan.
17 As the court observed in <u>Pajot</u>, "the substance of the
   transaction, although instantaneous, is that the second
18 creditor is paying off the debtor's unsecured deficiency debt
   on the first vehicle."  <u>Pajot</u>, 371 B.R. at 154.

19

20 <u>Lavigne</u>, 2007 WL 3469454 at *8.

21          DaimlerChrysler requests that I utilize the doctrine of in pari

22 materia to incorporate into the UCC term "price of the collateral" the

23 definition of "cash sale price" from Oregon's automobile sales and

24 finance law, found at O.R.S. § 83.510(1).  Doing so, however, does not

25 advance DaimlerChrysler's argument.  In fact, O.R.S. § 79.0201(2)

26 specifically provides that Article 9 of the UCC as adopted in Oregon is

Page 13 - **AMENDED** MEMORANDUM OPINION

1  subject to the retail installment contract provisions of O.R.S. §§ 83.510

2  to 83.680.

3          O.R.S. § 83.510(1) provides:

4      "Cash sale price" means the price for which the motor vehicle
       dealer would sell to the buyer, and the buyer would buy from
5      the motor vehicle dealer, the motor vehicle that is covered by
       the retail installment contract, if the sale were a sale for
6      cash instead of a retail installment sale.  The cash sale price
       may include any taxes, registration, license and other fees and
7      charges for accessories and their installation and for
       delivering, servicing, repairing or improving the motor
8      vehicle.

9  This definition of "cash sale price" does not explicitly include negative

10 equity, as do similar statutes in New York, Georgia, and California.

11 Nevertheless, DaimlerChrysler asserts that the omission is immaterial,

12 because the list of additional items O.R.S. § 83.510(1) says may be

13 included in the cash sale price does not <u>exclude</u> negative equity.

14          DaimlerChysler's reasoning fails for two reasons.  First,

15 because the "cash sale price" is the price the Johnsons would have paid

16 the Dealer in a cash transaction, it logically cannot include negative

17 equity.  The Johnsons never would have paid the amount of the negative

18 equity to the Dealer in an all cash transaction; instead, they would have

19 paid the lender which financed the Trade-In directly.

20          Second, automobile finance transactions are subject to

21 Regulation Z of the Federal Reserve Board, which, beginning in 1998,

22 added disclosure requirements concerning the financing of negative

23 equity.  Thereafter, numerous states, including Oregon, enacted

24 legislation to address negative equity disclosures at the state level.

25 <u>See</u> Kenneth J. Rojc & Thomas K. Juffernbruch, <u>Negative Equity in Trade-In</u>

26 <u>Vehicles: Regulation Z and State Law Developments</u>, 55 Bus. Law. 1295

1    (2000).  Oregon's version of Regulation Z is contained in the Oregon
2    Motor Vehicle Retail Installment Sales Act, 1999 Or. Laws 525, codified
3    at O.R.S. § 83.520(3)(d), which mandates the form and content of a motor
4    vehicle retail installment contract in Oregon, and specifically requires
5    that any amount "actually paid or to be paid by the motor vehicle dealer
6    pursuant to an agreement with the buyer to discharge a security interest,
7    lien or lease interest on property traded in" is to be listed separately
8    from the "cash sale price of the motor vehicle which is the subject
9    matter of the retail installment contract."  Compare O.R.S.
10   § 83.520(3)(a) with O.R.S. § 83.520(3)(d).  If anything, O.R.S. § 83.520
11   indicates that negative equity is not a part of the "cash sale price" of
12   the Vehicle.

13        The doctrine of in pari materia is available for interpretation
14   of Oregon statutes.

15        In interpreting a statute, our task is to discern what the
          legislature intended.  That inquiry begins with the text of the
16        statutory provision itself, because the text is the best
          evidence of the legislature's intent.  Also pertinent at that
17        first level of analysis is the context of the statute under
          consideration.  Context includes other related statutes.
18

19   State v. Carr, 877 P.2d 1192, 1194 (Or. 1994) (en banc).

20        I find that in the context of deciding whether under Oregon law,
21   negative equity can be part of the "price of the collateral" and
22   therefore a purchase money obligation with respect to a consumer's
23   purchase of a vehicle, the legislative intent can be gleaned from the
24   text and context of the Oregon Motor Vehicle Retail Installment Sales
25   Act.  Accordingly, I find it appropriate, under the doctrine of in pari
26   materia, to use O.R.S. §§ 83.510(a) and 83.520(3) as aids in determining

Page 15 - **AMENDED** MEMORANDUM OPINION

1  what constitutes "price of the collateral" for purposes of O.R.S.

2  § 79.0103(1)(b).

3  For the reasons stated above, I conclude that negative equity

4  does not constitute part of the purchase price of the Vehicle under

5  Oregon law.

6

7  2. Value given to enable debtor to acquire rights in the
   collateral

8

9  A purchase money obligation also can arise based on "value given

10 to enable the debtor to acquire rights in or the use of the collateral if

11 the value is in fact so used."[8]  O.R.S. § 79.0103(1)(b).  Not

12 surprisingly, there is considerable overlap in the analyses courts have

13 used in interpreting the phrase "value given to enable the debtor to

14 acquire rights in or the use of the collateral if the value is in fact so

15 used" and in determining the meaning of "price of the collateral."  That

16 overlap principally occurs in the application of Official Comment 3.

17 For instance, many courts evaluate the Official Comment 3 phrase

18 "value given to enable" to determine whether negative equity can be

19 / / /

20

21   [8]While a purchase money obligation based on "price of the
22 collateral" and a purchase money obligation based on "value given to
   enable the debtor to acquire rights in or the use of the collateral" both
23 give rise to a PMSI, the UCC recognizes a greater need to protect the
   PMSI which is based on the "price of the collateral" than the PMSI based
24 on the enabling loan.  See O.R.S. § 79.0324(7)("A security interest
   securing an obligation incurred as all or part of the price of the
25 collateral has priority over a security interest securing an obligation
   incurred for value given to enable the debtor to acquire rights in or the
26 use of collateral."), and Official Comment 13 thereto.

Page 16 – **AMENDED** MEMORANDUM OPINION

considered an expense "incurred in connection with acquiring rights in the collateral."

The <u>Sanders</u> court ruled that financed negative equity was not value given to enable debtors to acquire rights in a vehicle because it did not represent an obligation for an expense incurred in acquiring rights in the collateral. <u>In re Sanders</u>, 2007 WL 3047233 at *13.

> The [expense] items listed [in Official Comment 3] are closely connected with the purchase of the vehicle itself - compensating the seller for the cost of delivering the vehicle, repaying the seller for sales taxes realized from the sale of the vehicle, paying for such administrative charges as title costs and license fees associated with transferring ownership of the vehicle from seller to buyer, and the like. In addition, the list includes costs normally associated with the enforcement of the security interest once granted. . . .

<u>Id.</u> <u>See also</u> <u>In re Conyers</u>, 2007 WL 3244106 at *5 (payment of preexisting debt is not similar to other enumerated items); <u>In re Pajot</u>, 371 B.R. at 152 (that negative equity payoff is neither necessary nor compelled "cuts against" its inclusion with the list of expenses contained in Official Comment 3).

Given that financing negative equity is increasingly common, it was not an oversight that the legislature did not include negative equity in the list of "expenses incurred in connection with acquiring rights in the collateral" set forth in Official Comment 3. <u>In re Blakeslee</u>, 2007 WL 3133937 at *3. Further, negative equity is not of the same "type" or "magnitude" as the expenses listed in Official Comment 3. <u>Id.</u>

There is greater division among courts on the question of whether "value given" in the form of financing negative equity creates a close nexus with the acquisition of collateral.

/ / /

Page 17 - **AMENDED** MEMORANDUM OPINION

Some courts have found the requisite close nexus based on the package transaction itself. For instance, in finding that "[t]he phrase, 'value given to enable the debtor to acquire rights in' purchase money collateral is broad enough to include the 'negative equity' financed by a lender," the court in <u>In re Cohrs</u> found the required "close nexus" between the acquisition of the property and the secured obligation existed where the financed negative equity was "part of a single transaction and all components of the obligation incurred [were] for the purpose of acquiring the property securing the new obligation." <u>In re Cohrs</u>, 373 B.R. 107, 110 (Bankr. E.D. Ca. 2007). <u>See also</u> <u>In re Brei</u>, No. 4:07-BK-01354-JMM, 2007 WL 4104884 at *1 (Bankr. D. Ariz. Nov. 14, 2007)(deciding, without analysis, that "the entire amount which was lent was for the purpose of acquiring a vehicle, regardless of whether some portion thereof was used to pay off a previous lien on the trade-in."); <u>In re Petrocci</u>, 370 B.R at 499 (negative equity constitutes "value given to enable the debtor to acquire rights in the collateral" where "[n]egative equity financing is inextricably linked to the financing of the new car. It is clear that one would not take place without the other.").

Other courts have determined that negative equity financing does not provide the direct assistance for purchasing a vehicle that the standard "for value given to enable the debtor to acquire rights in . . . the collateral" requires. For example, the <u>Sanders</u> court recognized a distinction between facilitating a transaction and enabling a debtor to acquire <u>rights</u> in a new vehicle. "The fair implication of this [condition that the value given be 'in fact so used'] is that the value

must be used to acquire *rights* in the collateral, as opposed to, for example, *enabling the transaction* that ultimately results in the borrowers acquiring rights in the collateral." <u>Sanders</u>, 2007 WL 3047233 at *14 (emphasis in original). <u>In re Blakeslee</u>, 2007 WL 3133937 at *3 (The court observed that it did not find "the requisite close nexus between the payoff of negative equity and the acquisition of the new vehicle."). <u>See also</u> <u>In re Pajot</u>, 371 B.R. at 154 (because the substance of the transaction whereby negative equity is financed is that the second creditor is paying off the debtor's unsecured deficiency debt on the first vehicle, "it is not clear that there is a close nexus between the negative equity payoff and the acquisition of the new vehicle.").

It is not enough that value be given to acquire rights in the vehicle; the value given must be "in fact so used." <u>Sanders</u>, 2007 WL 3047233 at *14.

Still other courts look to the language "value given to enable" in an effort to determine whether the finance of negative equity qualifies as a purchase money obligation. Starting with the Black's Law Dictionary definition of enable, the <u>Conyers</u> court concluded that the financing of negative equity was not <u>required</u> for the debtor to purchase a new vehicle. Rather, the loan of additional money was "a convenience and an accommodation to the Debtor." <u>In re Conyers</u>, 2007 WL 3244106 at *5.

The court in <u>Acaya</u> found the words "value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used" to be ambiguous in the context of the Hanging Paragraph. <u>In re Acaya</u>, 369 B.R. at 569. Applying <u>Matthews v. Transamerica Fin.</u>

Page 19 – **AMENDED** MEMORANDUM OPINION

1  Servs. (In re Matthews), 724 F.2d 798 (9th Cir. 1984), which held that a

2  refinance destroyed the purchase money character of an obligation, as

3  part of its rationale, the Acaya court concluded that "the amount used to

4  pay the negative equity does not constitute . . . value given to acquire

5  rights in the collateral . . . ." In re Acaya, 369 B.R. at 570.

6       In Matthews, the Ninth Circuit addressed the character of an

7  enabling loan in deciding a motion to avoid a non-PMSI in debtor's

8  property under § 522 of the bankruptcy code. Matthews, 724 F.2d at 799-

9  801. While Matthews arises in the context of lien avoidance and predates

10 the enactment of Revised Article 9, it is nevertheless instructive for

11 this case. Prior UCC § 9-107 defined a PMSI as a security interest taken

12 by a person who "gives value to enable the debtor to acquire rights in or

13 use of collateral if such value is in fact so used." This is essentially

14 the same phrase as used in current O.R.S. § 79.0103(1)(b), except that in

15 the current version the article "the" is inserted before "collateral."

16 Matthews articulates that a refinance constitutes value to enable debtors

17 to pay off a loan, not to acquire rights in collateral. Speaking to the

18 apparent harshness of the loss of a PMSI through a refinance, the

19 Matthews court stated:

20      The argument that form should not be elevated over substance
        has merit in some settings, but not here. We are dealing with
21      a statutory scheme that governs the priorities among creditors.
        Purchase money security is an exceptional category in the
22      statutory scheme that affords priority to its holder over other
        creditors, but only if the security is given for the precise
23      purpose as defined in the statute. And we should not lose
        sight of the fact that the lender chooses the form.

24

25 Id. at 801.

26 / / /


Page 20 – **AMENDED** MEMORANDUM OPINION

In the matter before me, the financed negative equity is nothing more than a refinance of the pre-existing debt owed on the Trade-In. Accordingly, it does not create the requisite close nexus between "value given" and the Johnsons' acquisition of rights in the Vehicle. I previously have determined that financing of negative equity is not an expense incurred as part of the "price of the collateral." Neither is it value given and used to enable a debtor to acquire rights in the collateral.

     3.  <u>Financed negative equity is not a purchase money obligation.</u>

Because financed negative equity is neither an obligation incurred as "all or part of the price of the collateral" nor an obligation incurred "for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used," for purposes of O.R.S. § 79.0103(1)(b), financed negative equity is not a purchase money obligation.

D.  <u>Applicability of the Hanging Paragraph</u>

Having determined that the financed negative equity portion of DaimlerChrsyler's Claim is not covered by a PMSI, I now must decide what effect that determination has on treatment of the Claim under the Plan.

Most courts concluding that financed negative equity is not a purchase money obligation then apply one or the other of two interpretive rules, developed under state UCC law, for dealing with the secured creditor's PMSI: the "transformation rule" or the "dual status rule." "The 'transformation rule' provides that when a transaction contains both

purchase money and non-purchase money obligations, the entire transaction is transformed into a non-purchase money obligation." <u>In re Burt</u>, No. 07-23193, 2007 WL 4087071 n.34 (Bankr. D. Utah Oct. 24, 2007). The dual status rule "allows a security interest to have both the status of a PMSI, to the extent that it is secured by collateral purchased with loan proceeds, and the status of a general security interest, to the extent that the collateral secures obligations unrelated to the purchase." <u>In re Petrocci</u>, 370 B.R. at 504.

Those courts which have applied the transformation rule generally hold that the Hanging Paragraph does not afford any protection against cramdown of the secured creditor's claim. <u>See</u> <u>In re Blakeslee</u>, 2007 WL 3133937 at *5 (court is unwilling to "unwind the manipulations" applying the dual status rule would require of it); <u>In re Price</u>, 363 B.R. at 746 ("[G]enerally when negative equity is involved, the appropriate rule is the transformation rule.").

Those courts which have applied the dual status rule have allowed protection against cramdown under the Hanging Paragraph only for the portion of the secured creditor's claim that is a purchase money obligation. <u>See Hernandez-Simpson</u>, 369 B.R. at 46 (under Kansas law, dual status rule applies even to consumer transactions); <u>In re Lavigne</u>, 2007 WL 3469454 at *1 n.1 (adopting dual status rule unless a negative equity transaction is "structured such as to obfuscate transaction details or otherwise abuse the dual status rule," in which case the court would "not hesitate to discretionarily apply the more stringent transformation rule"); <u>In re Conyers</u>, 2007 WL 3244106 at *6 (applying dual status rule preserves congressional intent in enacting the Hanging

Page 22 - **AMENDED** MEMORANDUM OPINION

Paragraph); <u>In re Hayes</u>, 376 B.R. 655, 676 (Bankr. M.D. Tenn. 2007)(applying dual status rule such that a secured creditor holds a PMSI "within the scope of the hanging sentence to the extent of its claim less . . . the payoff of negative equity. . . ."); <u>Westfall II</u>, 376 B.R. 210 (applying dual status rule, but not as a matter of state law); <u>In re Honcoop</u>, No. 07-1358, 2007 WL 3133936 (Bankr. M.D. Fla. Sept. 19, 2007)(in a case finding that GAP insurance was not purchase money obligation, court applied dual status rule to reduce secured claim by amount of non-purchase money obligation; balance of secured claim was not subject to bifurcation under the Hanging Paragraph); <u>In re Pajot</u>, 371 B.R. at 163 (applying dual status rule, but "not without reservation"); <u>In re Acaya</u>, 369 B.R. at 571 (applying dual status rule; finding no impediment to easy allocation of prepetition payments given traceability resulting from compliance with California's automobile sales and finance laws).

        Two recent decisions have turned immediately from the analysis of whether the secured creditor has a purchase money obligation based on financing negative equity to application of the Hanging Paragraph, without first determining the impact of the secured creditor's non-purchase money obligation under state law. <u>In re Mitchell</u>, 2007 WL 3378229 at *5; <u>In re Sanders</u>, 2007 WL 3047233 at *17-18. The <u>Mitchell</u> and <u>Sanders</u> courts focused on the phrase "if the creditor has a purchase money security interest securing the debt that is the subject of the claim." Their reasoning is that Congress' use of the conditional "if" rather than more flexible language such as "to the extent," coupled with the omission of any quantifying modifier to the word debt, <u>e.g.</u> "part of"

1  the debt, requires an absolute result, mandating application of the
2  transformation rule rather than the dual status rule.[9]

3      In yet another analytical variation, the Westfall II court
4  utilized the "excluded purpose" doctrine[10] of federal statutory
5  interpretation in concluding that it was not appropriate to look to state
6  law to ascertain whether the transformation rule or the dual status rule
7  should apply to determine the impact on a PMSI when part of the subject
8  debt is not a purchase money obligation.  Westfall II, 376 B.R. at 216-
9  17.  In reaching this conclusion, the Westfall II court observed, as
10  noted above, that Official Comment 8 expressly provides that the state
11  law definition of PMSI was not meant to apply to bankruptcy law.  Without
12  analyzing the language of the Hanging Paragraph, the court "adopted" the
13  dual status rule because "[s]imply, application of the transformation
14  rule is too severe."  Id. at 219.

15      I now turn to the task of applying these concepts to the matter
16  before me.

17  / / /

18  / / /

19

20

---

21      [9]But see In re Hayes, 376 B.R. 655, 676 (Bankr. M.D. Tenn.
22  2007)("The hanging sentence mixes state and federal legal principles in
    the complicated manner discussed above.  Overlaying a federal
23  transformation rule produces a wobbly three-legged stool anchored by no
    obvious congressional policy choice in this context.").
24
        [10]"Excluded purpose means that a state statute should not serve as a
25  federal rule of decision if the federal purpose was excluded from the
    state law.  That is the case in the state law definition of purchase
26  money."  Westfall II, 376 B.R. at 216.

Page 24 – **AMENDED** MEMORANDUM OPINION

Oregon's Revised Article 9[11] adopted the dual status rule for non-consumer transactions, so that even if purchase money collateral also secures an obligation that is not a purchase money obligation, the PMSI does not lose its status as such for any portion of the debt.  O.R.S. § 79.0103(6)(a).  Oregon's dual status rule has broader implications however, because it provides, again in non-consumer transactions, that a PMSI does not lose its status even if the purchase money obligation is renewed, refinanced, consolidated, or restructured.  Id.  Whether to apply the dual status rule in consumer transactions is left to the discretion of the courts without further guidance from the statute.

> The limitation of the rules . . . of this section to transactions other than consumer-goods transactions is intended to leave to the court the determination of the proper rules in consumer-goods transactions.  The court may not infer from that limitation the nature of the proper rule in consumer-goods transactions and may continue to apply established approaches.

O.R.S. § 79.0103(8).

In light of that discretion, I return to the language of the Hanging Paragraph to examine it in context in the Bankruptcy Code, as modified by BAPCPA.  That is appropriate because in interpreting the language of a code provision, it is essential to consider "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  Robinson v. Shell Oil Co. 519 U.S. 337, 341 (1997).  Statutory interpretation is a "holistic endeavor."  United Sav. Ass'n of Texas v. Timbers of Inwood, 484 U.S.

---

[11]For a discussion of the transformation rule and the dual status rule under former Article 9 and Revised Article 9, see Keith G. Meyer, A Primer on Purchase Money Security Interests Under Revised Article 9 of the Uniform Commercial Code, 50 U. Kan. L. Rev. 143, 155-161 (2001).

365, 371 (1988).  If the interpretation of statutory language is not clear from the plain meaning of the words used, the statute's context within the overall statutory framework should be examined, with appropriate consideration of the legislative history.  <u>Davis v. Michigan Dept. of Treasury</u>, 489 U.S. 803, 809 (1989) ("[S]tatutory language cannot be construed in a vacuum.  It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (citation omitted).

With those principles in mind, the relevant language of the Hanging Paragraph is "[f]or purposes of paragraph [1325(a)](5), section 506 shall not apply to <u>a claim</u> described in that paragraph if the creditor has a purchase money security interest securing <u>the debt</u> that is the subject of <u>the claim</u>. . . ." (emphasis added).  Congress did not state specifically that the Hanging Paragraph applied to a claim or debt "or any part or portion" of either.  Neither did Congress specify that the Hanging Paragraph could be applied only to the "entire" claim or debt.  I do not find the "plain language" of the Hanging Paragraph dispositive as to whether the "dual status" or the "transformation" rule should apply in this instance.

However, from the language of the Hanging Paragraph itself and its limited legislative history,[12] it is clear that the Hanging Paragraph was designed to combat a particular perceived abuse by debtors in chapter

---

[12]For an exhaustive review of the legislative history of the Hanging Paragraph, <u>see</u> the Addendum to Judge Lundin's decision in <u>In re Hayes</u>, 376 B.R. at 676-684.

Page 26 – **AMENDED** MEMORANDUM OPINION

1  13: purchasing a car shortly before a chapter 13 bankruptcy filing and
2  taking advantage of the substantial depreciation that occurs immediately
3  when a new car is driven off the lot to cram down the secured creditor's
4  collateral interest.

> Prior to BAPCPA, vehicle financers could be harmed by a debtor
> who acquired a vehicle in the months leading up to bankruptcy,
> then filed bankruptcy and crammed the creditor's claim down to
> the collateral value on the date of filing.  Due to the rapid
> depreciation of motor vehicles the moment they leave the
> dealer's lot, debtors could often reap a benefit by cramming
> down the debt, only paying a secured claim equal to the
> depreciated value of the car...In enacting the hanging
> paragraph, Congress fixed this disparity to ensure that debtors
> could not load up on vehicle-secured debt pre-petition only to
> cram it down to the collateral value in bankruptcy.

11  In re Pajot, 371 B.R. at 159.  See In re Lavigne, 2007 WL 3469454 at *11.

12          In light of that clear purpose behind the Hanging Paragraph, it
13  does not make sense to apply the transformation rule and deprive the
14  creditor of the benefit under BAPCPA of its vehicle PMSI entirely because
15  the creditor has financed some negative equity in its transaction with
16  the debtor.  I find that applying the dual purpose rule is more
17  consistent with congressional intent, as reflected in the Hanging
18  Paragraph.  Accordingly, I find that § 506 does not apply to the portion
19  of the Claim that is not a debt for negative equity financing, and
20  cramdown does not apply to that portion of DaimlerChrysler's Claim.  I
21  will sustain Daimler Chrysler's objection to the Plan in part, and I will
22  deny confirmation of the Plan and enter a 28-day order for the Johnsons
23  to file a modified plan.

24  / / /
25  / / /
26  / / /

Page 27 - **AMENDED** MEMORANDUM OPINION

CONCLUSION

Financed negative equity is neither part of the "price of the collateral" being purchased, nor is it "value given to enable the debtor to acquire rights in or the use of the collateral" being purchased. It must be one or the other in order to be a purchase money obligation under O.R.S. § 79.0103(1)(b). Because a debt must be a purchase money obligation in order to give rise to a PMSI, a security interest based on debt arising from financed negative equity, paying off antecedent debt, cannot be a PMSI. However, applying the "dual status" rule, as allowed in the court's discretion under O.R.S. § 79.0103(8) and consistent with the language and intent behind Congress's adoption of the Hanging Paragraph, I hold that the protection of the Hanging Paragraph against cramdown applies to the PMSI portion of DaimlerChrysler's Claim and sustain DaimlerChrysler's objection to the Johnsons' Plan, in part. I will deny confirmation of the Plan and enter a 28-day order for the filing of a modified chapter 13 plan by the Johnsons.

cc:     Todd Trierweiler
        Lee M. Hess
        Brian D. Lynch, Trustee
        U.S. Trustee

Page 28 – **AMENDED** MEMORANDUM OPINION